**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 00-10636

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JIMMY RAY BARNETT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas
(6:99-CR-063-C)

_____

August 31, 2001

Before JOLLY, SMITH, and WIENER, Circuit Judges.

PER CURIAM[*]:

Defendant-Appellant Jimmy Ray Barnett challenges his convictions for conspiracy to possess methamphetamine and possession with intent to distribute methamphetamine and amphetamine, as well as his sentences for those convictions. We affirm.

---

[*] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1

FACTS AND PROCEEDINGS

In 1998, Barnett and his associates became the objects of a methamphetamine ("meth") distribution investigation by Texas Narcotics officials. Court-authorized surveillance led them to believe that Barnett and others were involved in an extensive drug distribution scheme. During a traffic stop of Tommy Haynes, an associate of Barnett, police recovered approximately 110 grams of meth and 50 grams of amphetamine. They discovered that B & W Motors ("B & W"), Barnett's place of business, held a lien on the van driven by Haynes. A subsequent search of B & W yielded drug paraphernalia and a ledger that the investigating officers believed was used to record drug transactions.

Based on this information and the information recovered from the surveillance, the investigating officers sought and received four search warrants. Pursuant to one of these warrants, they executed a search of Barnett's residence. During this search, the agents recovered drug paraphernalia which included measuring scales, ledgers, how-to books, chemical equations, counter-surveillance materials, cutting agents, and a small amount of meth, as well as the phone number of Jimmy Don Hardin, another suspected conspirator. A subsequent search of Hardin's residence turned up over 300 grams of meth and Barnett's phone numbers. Surveillance (wiretaps and pen registers) information documented numerous telephone calls between Hardin and Barnett.

The following month, Barnett was charged on five counts: Conspiracy to Distribute and Possess with Intent to Distribute 50 grams or more of Methamphetamine (Count 1); Possession with Intent to Distribute 50 grams or more of Methamphetamine (Count 3); Possession with Intent to Distribute Amphetamine and Methamphetamine (Count 4 and 6); and Felon in Possession of a Firearm (Count 8). These charges were based on the information recovered from his residence, the residence of his alleged co-conspirators, and surveillance of his home and business.

In a pre-trial motion, Barnett contested the validity of the search of his residence on the grounds that the information on the basis of which the warrant issued was insufficient to establish a nexus between his residence and any alleged drug conspiracy, and that the officers who executed the warrant could not have relied on it in good faith. After hearing testimony from Agent Navarro, the law enforcement official whose affidavit supported the warrant, the district court denied Barnett's suppression request.

At the completion of a jury trial in which three of his co-conspirators testified for the government, Barnett was convicted on all five counts. The district court sentenced him to 480 months on Counts 1 and 3, 240 months on Count 4 and 6, and 120 months on Count 8, with all sentences to run concurrently. Barnett timely filed a notice of appeal.

II.

ANALYSIS

A.  Evidence from Search of Barnett's Residence

   1.  Standard of Review

   When reviewing a denial of a motion to suppress involving a search warrant, we engage in a two-step process: We first determine whether the good-faith exception to the exclusionary rule, clarified in <u>United States v. Leon</u>, applies;[1] then, if we conclude that the officers did not act in good faith reliance on a facially valid warrant, we determine whether the magistrate had a substantial basis for finding that probable cause existed.[2]  If, however, we are satisfied that the good-faith exception applies, we do not reach the question of probable cause.[3]  We review the underlying findings of fact for clear error, but we review the determination of good faith <u>de novo</u>.[4]  Accordingly, we review <u>de novo</u> the district court's determination of the reasonableness of the executing officer's reliance on the warrant.

   2.  Good Faith

   After Barnett's suppression hearing, the district court determined that (1) there was probable cause for the issuance of

---

[1]  <u>United States v. Leon</u>, 468 U.S. 897 (1984).

[2]  <u>United States v. Cherna</u>, 184 F.3d 403, 407 (5th Cir. 1999).

[3]  <u>Id</u>. (quoting <u>United States v. Craig</u>, 861 F.2d 818, 820 (5th Cir. 1988) ("Principles of judicial restraint and precedent dictate that, in most cases, we should not reach the probable cause issue if a decision on the admissibility of the evidence under <u>Leon</u> will resolve the matter.").

[4]  <u>Id</u>.

the warrant, (2) the police acted in good faith, and (3) a sufficient nexus between the drug conspiracy and Barnett's residence justified the search. Barnett contests the district court's determination of good faith on two grounds: Agent Navarro omitted material facts from his affidavit in support of a search warrant; and the agent failed to establish a nexus between the items searched for and Barnett's residence.

The Fourth Amendment does not require suppression of evidence obtained from an objectively reasonable warrant even if the warrant is later found to be deficient.[5] The Amendment requires only that the law enforcement officer's reliance on the warrant be objectively reasonable. The good-faith exception does not apply, and suppression is an appropriate remedy, under any one or more of four situations: (1) The issuing magistrate was misled by an affiant who knowingly, or with reckless disregard for the truth, provided the affidavit on which the magistrate relied; (2) the magistrate wholly abandoned his judicial role and acted as part of the law enforcement team; (3) the law enforcement officer relied on a warrant based on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable; (4) the warrant itself was so facially deficient that the executing officers could not have reasonably relied on its validity.[6]

---

[5] Leon, 468 U.S. at 922.

[6] Cherna, 184 F.3d at 407-08.

5

Satisfied that the district court's findings are free of clear error, we conclude that none of these four situations is present in Barnett's case. First, as found by the district court, Agent Navarro, on whose affidavit the magistrate relied, neither materially misstated any facts in his affidavit nor omitted any material facts from it. He was an experienced law enforcement officer who included the relevant aspects of his investigation in his statement to the magistrate. Second, the magistrate did not abandon his judicial role and act as part of the law enforcement team. The district court found that the magistrate was impartial and that he based his decision solely on the information within the four corners of the affidavit. Third, the affidavit and warrant were not so lacking in indicia of probable cause as to make reliance on them entirely unreasonable. As we have held, when a warrant is supported by more than a "bare bones" affidavit, officers may assume in good faith that it is valid.[7] Here, Agent Navarro's affidavit detailed the results of the criminal investigation leading up to the seeking and granting of the warrant. It included specific information derived from the surveillance of Barnett and his co-conspirators. Finally, the

---

[7] <u>United States v. Fields</u>, 72 F.3d 1200, 1214 (5th Cir. 1996) ("When a warrant is supported by more than a 'bare bones' affidavit officers may rely in good faith on the warrant's validity. Bare bones affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.") (citing <u>United States v. Satterwhite</u>, 980 F.3d 317, 320-21 (5th Cir. 1992)).

warrant itself was not facially deficient.  It specified the place to be searched and the evidence to be seized, if found.  The district court found that Agent Navarro's affidavit established an ongoing pattern of criminal activity and that it contained nothing to indicate that, after the activity had ceased to operate from B & W, Barnett had moved his drug distribution operation anywhere but to his home.

As the actions of the magistrate and the executing officers do not fall into any of the four situations described above, the good-faith exception applies.  The district court correctly concluded that the evidence recovered from the search of Barnett's residence need not be suppressed.  Having decided on the admissibility of the seized evidence under the Leon guidelines, we follow the teachings of Cherna and Craig and decline to address whether the magistrate had a substantial basis for finding probable cause.

B.  Drug Quantity Determination

    1.  Standard of Review

We review the district court's determination of the amount of drugs for which a defendant is responsible for clear error.[8]  We will affirm a district court's sentence based on its drug quantity determination if the sentence results from a correct application of the sentencing guidelines to factual findings that are not clearly

---

[8]  United States v. Mergerson, 4 F.3d 337, 345 (5th Cir. 1993).

7

erroneous.[9]  A district court's finding is not clearly erroneous if it is plausible in light of the record as a whole.[10]

### 2. Barnett's Responsibility for More than 5 Kilograms

The Presentence Report ("PSR") concluded, and the district court found, that Barnett was responsible for over 5 kilograms of meth. Accordingly, the PSR determined, and the court applied, a base offense level of 36 under the sentencing guidelines.  During his sentencing hearing, Barnett argued that he could not be held responsible for 5 kilograms and that, at most, his base level should be 30.  We discern the district court's determinations in this regard to be plausible in light of the record as a whole, and therefore affirm.

The offense level for a defendant convicted of drug trafficking is determined by the quantity of drugs for which he is responsible.[11]  Barnett is responsible for the amount of meth with which he was directly involved plus any amounts attributable to him as reasonably foreseeable within a jointly undertaken criminal activity.[12]    Reasonable  foreseeability,  however,  does  not

---

[9]  United States v. Sparks, 2 F.3d 574, 586 (5th Cir. 1993).

[10]  Id.

[11]  U.S.S.G. § 1B1.3 n. 2; United States v. Puig-Infante, 19 F.3d 929, 942 (5th Cir. 1994).

[12]  Id.

8

automatically follow from membership in a conspiracy.[13] To attribute a drug quantity to Barnett through reasonable foreseeability, the sentencing court must specifically find (1) the quantity of drugs encompassed by the conspiracy and (2) the portion of such quantity that Barnett knew about or should have foreseen.[14] Here, the district court did not make these findings, but simply stated conclusionally, in response to Barnett's objections at his sentencing, that Barnett was responsible for more than 5 kilograms of meth. We cannot, therefore attribute the conspiracy's total drug amount to Barnett on nothing more than the bare statement of the court, but instead must limit our review to whether, based on the evidence of Barnett's direct involvement with meth, the district court clearly erred in finding him responsible for more than 5 kilograms.

During sentencing, the government introduced four ledgers seized during the searches of the B & W premises and Barnett's residence. Agent Navarro, an experienced narcotics officer, testified that one of the ledgers seized from the residence detailed drug transactions totaling 1.8 to 2 kilograms. Navarro also testified that a second ledger, seized at B & W, evidenced

_____

[13] Puig-Infante, 19 F.3d at 942 ("For a particular defendant, however, 'reasonable forseeability does not follow automatically from proof that [the defendant] was a member of a conspiracy.'") (quoting United States v. Puma, 937 F.2d 151, 160 (5th Cir. 1991) cert. denied, 502 U.S. 1092 (1992)).

[14] Id.

drug transactions totaling 2.2 to 2.5 kilograms. Based on these two ledgers alone, Barnett was directly involved with up to 4.5 kilograms of meth. Additionally, when questioned about the other two ledgers presented at the sentencing hearing, Agent Navarro testified that even though these ledgers did not specify dates or exact quantities, they accounted for multi-pound amounts of meth. Finally, Barnett admits that he can be held responsible for the 3 pounds of meth sold to him by Jimmy Don Hardin, a co-conspirator. As one pound equals roughly 0.45 of a kilogram, three pounds would equal approximately 1.36 kilograms. Even if we use only the minimum amounts of 1.8 and 2.2 kilograms represented by the two ledgers and add the 1.36 kilograms concededly acquired from Hardin, Barnett is responsible for more than 5 kilograms.

Arguing that aggregating the quantities represented by all four ledgers plus the amount attributable to him through acts of co-conspirators constitutes "double counting," Barnett contends that he was involved with less than 5 kilograms, 4.5 kilograms at the most. When viewed as a whole, however, the record does not preclude the possibility that the transactions reflected in the four ledgers and the transaction between Barnett and Hardin, represent separate and non-overlapping transactions. The district court thus reached a plausible conclusion when it found Barnett responsible for more than 5 kilograms. Constrained by our deferential standard of review, we cannot conclude that the district court's drug quantity determination was clearly erroneous.

C.  Sentence Enhancement for Leader/Organizer

   1.  Standard of Review

   Determination whether a defendant is a U.S.S.G. § 3B1.1 leader or organizer is a factual one.[15]  Therefore, we cannot disturb the district court's findings regarding Barnett's role as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," unless we conclude that those findings are clearly erroneous.[16]

   2.  Barnett's Role as a Leader/Organizer

   Unlike some of our fellow circuits, we treat § 3B1.1 analysis disjunctively.  When determining whether a criminal organization is "otherwise extensive," we consider the totality of the evidence.[17]  Here, we must determine whether, in light of the record as a whole, it is plausible that Barnett was more than a mere buyer and seller, but did in fact exert authority and control over others.  For assessing a defendant's role as a leader/organizer, the Sentencing Guidelines direct a court to consider (1) the exercise of decision making authority, (2) the nature of participation in the commission

---

[15]  United States v. Valencia, 44 F.3d 269, 272 (5th Cir. 1995).

[16]  Id. at 347.

[17]  See United States v. Wilson, 240 F.3d 39, 47 (D.C. Cir. 2001) (recognizing that circuits are currently split on the factors relevant to an activity being "otherwise extensive" and noting that this circuit has chosen to look to a broad range of factors beyond the number of persons involved to determine "otherwise extensive" activity).

of the offense, (3) the claimed right to a larger share of the fruits of the crime, (4) the degree of participation in planning or organizing the offense, (5) the nature and scope of the illegal activity, and (6) the degree of control and authority exercised over others.[18]

Testimony at Barnett's trial revealed three facts relevant to these criteria. First, at one time or another, five persons named in the indictment worked for Barnett at B & W.[19] Four of those subordinates pleaded guilty to various violations of the Controlled Substance Act and are awaiting sentencing. Second, the ledgers and drug equipment recovered suggest that Barnett was purchasing and selling distribution quantities of meth, not merely personal use quantities. Finally, as confirmed by Agent Navarro's testimony, ledgers like the ones kept by Barnett, which contain monetary figures and drug quantities, are generally used only when the keeper of the ledger is "fronting" money and drugs to others who subsequently sell the drugs. Based on these facts, Agent Navarro was of the opinion, and so testified, that Barnett was involved in all aspects of the drug distribution scheme, including acquisition, packaging, redistribution, and collection of monies. Admittedly, no direct evidence precisely establishes that Barnett directed and

---

[18] U.S.S.G. § 3B1.1 n. 4.

[19] Agent Navarro testified that Michael Pallone, Danny Sturgill, Carlos Sanchez, Randy Dupre, and Tracie Barnett were at one time or another employees of B & W.

12

controlled other participants.[20] Still, a strong inference to that effect flows from the master-servant relationship at B & W. On the other hand, even though some record evidence suggests that Barnett profited from these crimes, none suggests that he ever asserted a right to a larger share of the profits than anyone else.

Given these countervailing facts and inferences, and the other enhancement options available to the district court, Barnett's role as a leader/organizer presents a close question.[21] The district court did not articulate the factual basis for its leadership determination. We noted in United States v. Valencia, however, that the district court's statement that a defendant is a manager or leader is itself a finding of fact, and proceeded to affirm the district court's § 3B1.1 finding in the absence of a specifically articulated factual basis.[22] Relying on our rulings in United

---

[20] See United States v. Ronning, 47 F.3d 710, 712 (5th Cir. 1995) ("Consequently, a leader or organizer must control or influence other people.... Management responsibility does not make a leader or organizer.").

[21] U.S.S.G. § 3B1.1 provides, in relevant part:
Based on the defendant's role in the offense, increase the offense level as follows:
(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

[22] See United States v. Valencia, 44 F.3d 269, 273 (5th Cir. 1995) (quoting United States v. Mejia-Orosco, 867 F2d 216, 221 (5th

13

States v. Mejia-Orosco and Valencia and assessing the plausibility of the district court's finding in light of the admittedly ambivalent record — plus armed with the knowledge that the sentencing judge presided over the trial and had the advantage of hearing the testimony first-hand, noting all inflections and observing facial expressions and body language — we have sufficient confidence in the district court's finding to conclude that it did not clearly err in branding Barnett a leader or organizer.

D.  Apprendi Error

   1.  Standard of Review

   Barnett did not object at trial to the fact that the jury did not establish drug quantity beyond a reasonable doubt.  We therefore review the district court's actions for plain error.[23]

   2.  Harmlessness of Apprendi Error

   Apprendi teaches that when drug quantity is an essential

---

Cir. 1989), cert. denied, 492 U.S. 924 (1989) ("[T]he district court's simple statement that the defendant is a 'manager' or 'leader' is a finding of fact.")).

   We note, however, that while Mejia-Orosco and Valencia stand for the proposition that we do not categorically require the district court to articulate a specific factual basis for its determination, we stress that, whenever possible, the district court should include a statement of such findings.  See Valencia, 44 F.3d at 273 (quoting Mejia-Orosco, 867 F.2d at 221 "We recognize that so formal a requirement would interfere with the smooth operation of the sentencing hearing.  In some instances, what is necessarily a 'judgment call' may not be susceptible to particularization.  Nonetheless, we urge the district court to clarify their ultimate factual findings by more specific findings when possible.")(emphasis added)).

   [23]  United States v. Miranda, 248 F.3d 434, 443 (5th Cir. 2001).

14

element of the offense and the government may seek an enhanced penalty based on quantity, the district court's instructions must expressly identify drug quantity as an essential element to be proved by the prosecution beyond a reasonable doubt.[24]  Here, the drug quantity was expressed both in the indictment and on the jury verdict form.  Thus, even though the district court (which did not have the benefit of the Supreme Court's Apprendi opinion) did not, in its jury charge, specifically instruct the jury to find drug quantity beyond a reasonable doubt, the jury was arguably asked to find beyond a reasonable doubt whether Barnett was involved in a conspiracy to distribute, and possessed with intent to distribute, over 50 grams of meth: (1) The quantity was specified in the indictment; (2) the quantity was set forth on the form provided by the court for the jury's verdict; and (3) the jury was instructed generally that the government must prove its case beyond a reasonable doubt.

Nevertheless, Apprendi sets a more exacting standard.[25]  In Clinton, we held that even though the jury was arguably asked to find drug quantity, and may have understood all the elements of the offense including quantity, Apprendi error existed because the jury was not expressly directed to find beyond reasonable doubt that the

---

[24]  Apprendi v. New Jersey, 530 U.S. 466 (2000);  United States v. Clinton, 256 F.3d 311, 315 (5th Cir. 2001).

[25]  Clinton, 256 F.3d at 315.

15

conspiracy involved 50 grams or more of cocaine base.[26]  Hence, the district court's <u>Apprendi</u> error here is plain.

This determination does not, however, end our inquiry.  Even when plain error is committed, we still must determine whether the error was harmless.[27]  When a jury is not instructed as to an element of an offense, we test "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element."[28]  Here, in light of the large, multi-kilo quantity of meth involved, the jury could not have rationally found Barnett responsible for <u>less</u> than 50 <u>grams</u> of meth.  During trial and sentencing Barnett disputed his responsibility for more than 5 <u>kilograms</u> of meth; he never disputed his responsibility for 50 <u>grams</u>.  Using only one of the ledgers seized from his residence, Barnett would be responsible for at least 1.8 kilograms of meth.  Furthermore, Barnett conceded that he could be held responsible for the 3 pounds (1.36 kilograms) of meth that he purchased from Hardin.  Given the inclusion of drug quantity in the indictment and on the verdict form returned by the jury, together with a plethora of trial evidence regarding kilograms of contraband directly attributable to Barnett, we are firmly convinced that the <u>Apprendi</u> error here was harmless.

---

[26]  <u>Id</u>.

[27]  <u>Id</u>.

[28]  <u>Id</u>. (quoting <u>Neder v. United States</u>, 527 U.S. 1 (1999)).

16

### III.

### CONCLUSION

For the foregoing reasons, Barnett's conviction and sentence are

AFFIRMED.